ROBBINS ARROYO LLP
BRIAN J. ROBBINS (190264)
brobbins@robbinsarroyo.com
CRAIG W. SMITH (164886)
csmith@robbinsarroyo.com
SHANE P. SANDERS (237146)
ssanders@robbinsarroyo.com
5040 Shoreham Place
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsarroyo.com

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| MARTIN SALSBERG, Derivatively on Behalf of KUSHCO HOLDINGS, INC., <br><br> Plaintiff, <br><br> v. <br><br> NICHOLAS KOVACEVICH, DALLAS IMBIMBO, ERIC BAUM, CHRISTOPHER TEDFORD, JIM MCCORMICK, CHRIS MARTIN, BARBARA GOODSTEIN, and DONALD HUNTER, <br><br> Defendants, <br><br> -and- <br><br> KUSHCO HOLDINGS, INC., a Nevada corporation, <br><br> Nominal Defendant. | Case No. <br><br> VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT <br><br><br><br><br><br><br><br><br><br> <u>DEMAND FOR JURY TRIAL</u> |

Plaintiff, by his attorneys, submits this Verified Stockholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge. This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.     This is a stockholder derivative action brought by plaintiff on behalf of nominal defendant KushCo Holdings, Inc. ("KushCo" or the "Company") against certain of its officers and directors for breach of fiduciary duty, waste of corporate assets, and unjust enrichment. These wrongs resulted in tens of millions of dollars in damages to KushCo's reputation, goodwill, and standing in the business community. Moreover, these actions have exposed KushCo to tens of millions of dollars in potential liability for violations of law.

2.     KushCo manufactures and distributes packaging products, vaporizers, hydrocarbon gases, solvents, accessories, and branding solutions to customers operating in the regulated medical and recreational cannabis industries. Defendants Nicholas Kovacevich ("Kovacevich"), the current Chairman of the Company's Board of Directors (the "Board") and Chief Executive Officer ("CEO"), and Dallas Imbimbo ("Imbimbo"), a KushCo director, founded KushCo in 2010 as a private company. The Company went public in January 2016.[1]

3.     Since then, KushCo has sought to expand its offerings and footprint by acquiring companies in the cannabis industry. In May 2017, the Company acquired CMP

---

[1] The Company was formally known as Kush Bottles, Inc. and changed its name in September 2018.

Wellness, LLC ("CMP Wellness"), a manufacturer and distributor of Med-ePen brand vaporizer pens, cartridges, tanks, and accessories.  The following year, in May 2018, KushCo acquired Summit Innovations, LLC ("Summit"), a distributor of hydrocarbon products, such as propane and butane, to the legal cannabis industry.  Then, in July 2018, the Company acquired The Hybrid Creative ("Hybrid"), a self-described premier creative agency for cannabis ventures, including branding, marketing, web application development, and e-commerce solutions.

4.     As a relatively new public company, KushCo disclosed that it was essentially in the process of building its internal controls from scratch in order to meet public company reporting obligations.  On July 13, 2017, KushCo filed with the SEC its Quarterly Report on Form 10-Q for the third quarter ended May 31, 2017 (the "Q3 2017 Form 10-Q").  The Q3 2017 Form 10-Q noted that management had evaluated the Company's disclosure controls and procedures and determined that they were not effective.  In addition, the Q3 2017 Form 10-Q stated that the Company's internal control over financial reporting was not effective due to a number of "material weaknesses, which are indicative of many small companies with small staff."  These material weaknesses included:  (i) inadequate segregation of duties consistent with control objectives; (ii) lack of a code of ethics; (iii) lack of a whistleblower policy; (iv) lack of an independent Board or Board committees related to financial reporting; and (v) lack of multiple levels of supervision and review.  The Q3 2017 Form 10-Q, however, assured the investing public that these weaknesses "have not had any material effect on [KushCo's] financial results," and that KushCo's "financial statements for the three and nine month periods ended May 31, 2017 are fairly stated, in all material respects, in accordance with U.S. [Generally Accepted Accounting Principles ("GAAP")]."  The Q3 2017 Form 10-Q also explained that management had developed a remediation plan to address the material weakness which would purportedly remediate the problems. According to the Q3 2017 Form 10-Q, the remediation efforts "will be implemented in the current 2017 fiscal year."

5.   The Company's Annual Report on Form 10-K for the fiscal year ended August 31, 2017 (the "2017 Form 10-K"), disclosed that KushCo's internal controls over financial reporting were still ineffective due to a number of material weaknesses, and that the remediation efforts touted in the Q3 2017 Form 10-Q had not in fact been implemented.  Notwithstanding KushCo's ineffective internal controls, in the 2017 Form 10-K, the Company assured investors and analysts that its financial statements could be relied upon.  Further, according to the 2017 Form 10-K, the Company's remediation plan would be implemented in the 2018 fiscal year.

6.   Despite these assurances, the Company continually failed to fix its internal controls.  Still, over the following year, the Company continued to boast that its financial statements could be relied upon.  For instance, in its Quarterly Report on Form 10-Q for the third quarter ended May 31, 2018, the Company stated that "[n]otwithstanding the assessment that our disclosure controls and procedures were not effective and that there were material weaknesses as identified" in the 2017 Form 10-K, "our financial statements fairly present our financial position, results of operations and cash flows … in all material respects."

7.   Unfortunately, these statements were woefully inaccurate.  On April 9, 2019, KushCo issued a press release revealing that the Company had been improperly accounting for certain contingent consideration related to its acquisitions, and would need to restate multiple years' worth of financial statements.  In particular, the Company disclosed that its financial statements for fiscal years 2017 and 2018 could not be relied upon and would need to be restated as a result of "errors in the accounting for certain shared-settled contingent consideration relating to the Company's acquisition of CMP Wellness in May 2017, Summit in May 2018, and Hybrid in July 2018."  While the contingent consideration related to each of these acquisitions earn-out arrangements should have been accounted for as liabilities, the Company improperly reported them as equity.  The Company estimated that as a result of the restatement, net losses for fiscal 2018 would more than double, from the previously reported $10.2 million to $24.3

million.

8.      On this news, KushCo's stock fell more than 7.76% on August 10, 2019, to close at $5.35 per share compared to the previous trading day's closing of $5.80 per share, erasing more than $39.6 million in market capitalization.

9.      As a direct result of the unlawful course of conduct detailed herein, the Company is now the subject of at least one federal securities class action lawsuit pending in the U.S. District Court for the Central District of California on behalf of investors who purchased KushCo shares (the "Securities Class Action").  The Securities Class Action seeks claims against KushCo and certain of the Individual Defendants in connection with the Company's misleading statements and improper accounting practices, including causes of action under sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

10.     Plaintiff brings this action against the Individual Defendants to repair the harm that they caused with their faithless actions.

## JURISDICTION AND VENUE

11.     Jurisdiction is conferred by 28 U.S.C. §1332.  Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interests and costs.

12.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

13.     Venue is proper in this Court pursuant to 28 U.S.C. §1391 because: (i) KushCo maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein occurred in this District; and (iv) defendants have received substantial compensation in this District by

doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

14.    Plaintiff Martin Salsberg was a stockholder of KushCo at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current KushCo stockholder.  Plaintiff is a citizen of Canada.

**Nominal Defendant**

15.    Nominal Defendant KushCo is a Nevada corporation with principal executive offices located at 11958 Monarch Street, Garden Grove, California. Accordingly, KushCo is a citizen of Nevada and California.  KushCo markets and sells packaging products, vaporizers, hydrocarbon gases, solvents, accessories, and branding solutions to customers operating in the medical and recreational cannabis industries.  The Company also provides custom branding on packaging products via its wholly owned subsidiary Hybrid that serves both cannabis and noncannabis clients across the United States, Canada, and Europe.  As of April 11, 2019, KushCo had 202 full-time employees.

**Defendants**

16.    Defendant Kovacevich is KushCo's Chairman of the Board and has been since November 2017, CEO and has been since August 2014, and also Secretary and a director and has been since December 2010.  Defendant Kovacevich was also KushCo's Chief Operating Officer ("COO") from December 2010 to August 2014.  Defendant Kovacevich cofounded the Company in December 2010.  Defendant Kovacevich is named as a defendant in the Securities Class Action that alleges he violated sections 10(b) and 20(a) of the Exchange Act.  Defendant Kovacevich knowingly, recklessly, or with gross negligence: (i) failed to ensure KushCo implemented and maintained effective disclosure controls and procedures at KushCo; (ii) failed to ensure KushCo implemented and maintained adequate internal controls over accounting and financial reporting; and (iii) made improper statements in the Company's press releases and public filings concerning KushCo's financial metrics and internal controls.    KushCo paid defendant

Kovacevich the following compensation as an executive:

| Year | Salary | Option Awards | Total |
|------|--------|---------------|-------|
| 2018 | $157,858 | $103,118 | $260,976 |
| 2017 | $87,042 | - | $87,042 |

Defendant Kovacevich is a citizen of California.

17.    Defendant Imbimbo is a KushCo director and has been since December 2010.  Defendant Imbimbo was also KushCo's Chairman of the Board from December 2010 to November 2017.  Defendant Imbimbo cofounded the Company in December 2010.  Defendant Imbimbo knowingly or recklessly: (i) failed to ensure KushCo implemented and maintained effective disclosure controls and procedures at KushCo; (ii) failed to ensure KushCo implemented and maintained adequate internal controls over accounting and financial reporting; and (iii) made improper statements in the Company's press releases and public filings concerning KushCo's financial metrics and internal controls. KushCo paid defendant Imbimbo the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|-------------|-------------------|---------------|-------|
| 2018 | $12,000 | $103,118 | $115,118 |

Defendant Imbimbo is a citizen of California.

18.    Defendant Eric Baum ("Baum") is a KushCo director and has been since December 2017.  Defendant Baum is a member of KushCo's Audit Committee and has been since March 2018.  Defendant Baum knowingly or recklessly: (i) failed to ensure KushCo implemented and maintained effective disclosure controls and procedures at KushCo; (ii) failed to ensure KushCo implemented and maintained adequate internal controls over accounting and financial reporting; and (iii) made improper statements in the Company's press releases and public filings concerning KushCo's financial metrics and internal controls. KushCo paid defendant Baum the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|-------------|-------------------|---------------|-------|
| 2018 | $12,000 | $103,118 | $115,118 |

| 2017 | - | $66,177 | $66,177 |

Defendant Baum is a citizen of New York.

19.  Defendant Christopher Tedford ("Tedford") is KushCo's Chief Financial Officer ("CFO") and has been since November 2018.  Defendant Tedford is named as a defendant in the Securities Class Action that alleges he violated sections 10(b) and 20(a) of the Exchange Act.  Defendant Tedford knowingly, recklessly, or with gross negligence: (i) failed to ensure KushCo implemented and maintained effective disclosure controls and procedures at KushCo; (ii) failed to ensure KushCo implemented and maintained adequate internal controls over accounting and financial reporting; and (iii) made improper statements in the Company's press releases and public filings concerning KushCo's financial metrics and internal controls.  Defendant Tedford is a citizen of California.

20.  Defendant Jim McCormick ("McCormick") was KushCo's COO from January 2018 to February 2019, and CFO from August 2017 to November 2018. Defendant McCormick is named as a defendant in the Securities Class Action that alleges he violated sections 10(b) and 20(a) of the Exchange Act.  Defendant McCormick knowingly, recklessly, or with gross negligence: (i) failed to ensure KushCo implemented and maintained effective disclosure controls and procedures at KushCo; (ii) failed to ensure KushCo implemented and maintained adequate internal controls over accounting and financial reporting; and (iii) made improper statements in the Company's press releases and public filings concerning KushCo's financial metrics and internal controls. KushCo paid defendant McCormick the following compensation as an executive:

| Year | Salary | Bonus | Option Awards | Total |
|------|--------|-------|---------------|-------|
| 2018 | $161,058 | $50,000 | $1,948,499 | $2,159,557 |
| 2017 | $13,068 | - | $483,718 | $496,786 |

Defendant McCormick is a citizen of Texas.

21.  Defendant Chris Martin ("Martin") was KushCo's CFO from July 2014 to July 2017.  Defendant Martin is named as a defendant in the Securities Class Action that

alleges he violated sections 10(b) and 20(a) of the Exchange Act.   Defendant Martin knowingly, recklessly, or with gross negligence: (i) failed to ensure KushCo implemented and maintained effective disclosure controls and procedures at KushCo; (ii) failed to ensure KushCo implemented and maintained adequate internal controls over accounting and financial reporting; and (iii) made improper statements in the Company's press releases and public filings concerning KushCo's financial metrics and internal controls. KushCo paid defendant Martin the following compensation as an executive:

| Year | Salary | Bonus | Option Awards | All Other Compensation | Total |
|------|--------|-------|---------------|------------------------|-------|
| 2017 | $87,833 | $16,000 | $163,529 | $105,800 | $373,162 |

Upon information and belief, defendant Martin is a citizen of California.

22.   Defendant Barbara Goodstein ("Goodstein") is a KushCo director and has been since November 2017.   Defendant Goodstein is a member of KushCo's Audit Committee and has been since March 2018.   Defendant Goodstein knowingly or recklessly: (i) failed to ensure KushCo implemented and maintained effective disclosure controls and procedures at KushCo; (ii) failed to ensure KushCo implemented and maintained adequate internal controls over accounting and financial reporting; and (iii) made improper statements in the Company's press releases and public filings concerning KushCo's financial metrics and internal controls.   KushCo paid defendant Goodstein the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|-------------|-------------------|---------------|-------|
| 2018 | $12,000 | $103,118 | $115,118 |

Defendant Goodstein is a citizen of New York.

23.   Defendant Donald Hunter ("Hunter") is a KushCo director and has been since February 2018.   Defendant Hunter is a member of KushCo's Audit Committee and has been since March 2018.   Defendant Hunter knowingly or recklessly: (i) failed to ensure KushCo implemented and maintained effective disclosure controls and procedures at KushCo; (ii) failed to ensure KushCo implemented and maintained adequate internal

controls over accounting and financial reporting; and (iii) made improper statements in the Company's press releases and public filings concerning KushCo's financial metrics and internal controls.  KushCo paid defendant Hunter the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2018 | $8,000 | $382,700 | $390,700 |

Defendant Hunter is a citizen of Massachusetts.

24.    The defendants identified in ¶¶16, 19-21 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶16-18, 22-23 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶18, 22-23 are referred to herein as the "Audit Committee Defendants."  Collectively, the defendants identified in ¶¶16-23 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

25.    By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe KushCo and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage KushCo in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of KushCo and not in furtherance of their personal interest or benefit.

26.    To discharge their duties, the officers and directors of KushCo were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of KushCo were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations;

(b)    ensure that the Company complied with its legal obligations and requirements—including requirements involving the filing of accurate financial and

operational information with the SEC—and refrain from engaging in deceptive conduct;

(c)     conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)     ensure processes were in place for maintaining the integrity and reputation of the Company and reinforcing a culture of ethics, compliance, and appropriate risk management, including having a working and functioning accounting department;

(e)     remain informed as to how KushCo conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

(f)     truthfully and accurately guide investors and analysts as to the business operations of the Company at any given time.

**Additional Duties of the Audit Committee Defendants**

27.     Under the KushCo Board's Audit Committee Charter, the Audit Committee Defendants, defendants Baum, Hunter, and Goodstein, owe and/or owed specific additional duties to KushCo.  According to the Audit Committee Charter, among other things, the Audit Committee is responsible for assisting the Board in overseeing the integrity of the Company's financial statements, the Company's compliance with legal and regulatory requirements, the Company's internal accounting and financial controls, the Company's policies with respect to risk management, and the implementation and effectiveness of the Company's ethics and compliance program.  In overseeing the Company's financial reporting process on behalf of the Board, the Audit Committee is tasked with the following functions:

8. Review and discuss with the independent auditors and management the results of the annual audit of the Company's consolidated financial statements prior to filing with the SEC on Form 10-K or distribution thereof, including (i) the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" and (ii) any appropriate matters regarding accounting principles, practices and judgments and the independent auditors' opinion as to the quality thereof and any items required to be communicated to the Committee by the independent auditors in accordance with standards established and amended from time to time by the Public Company Accounting Oversight Board ("PCAOB") and the American Institute of Certified Public Accountants ("AICPA").

9. Review and discuss with management and the independent auditors the Company's interim financial results to be included in the Company's quarterly reports prior to filing with the SEC on Form 10-Q, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" and any items required to be communicated to the Committee by the independent auditors in accordance with existing PCAOB and AICPA guidance.

10. Review and discuss with management, the independent auditors, and the internal auditors the quality and adequacy of the Company's financial reporting processes, internal controls and disclosure controls and procedures, including whether there are any significant deficiencies in the design or operation of such processes, controls and procedures, material weaknesses in such processes, controls and procedures, any corrective actions taken with regard to such deficiencies and weaknesses and any fraud involving management or other employees with a significant role in such processes, controls and procedures.

11. Review and discuss with the independent auditors any audit problems or difficulties and management's response thereto, including those matters required to be discussed with the Committee by the independent auditors pursuant to existing PCAOB and AICPA guidance and resolve any disagreements between management and the independent auditors regarding financial reporting.

12. Review with management and the independent auditors:

- any analyses or other written communications prepared by management, the internal auditors and/or the independent auditors setting forth significant financial reporting issues and judgments made in connection with the preparation of the consolidated financial statements, including analyses of the effects of alternative United States GAAP methods on the financial statements;

- the critical accounting policies and practices of the Company;

- off-balance sheet transactions and structures;

- any major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles;

- regulatory and accounting initiatives or actions applicable to the Company (including any SEC investigations or proceedings), and

- other material written communications between the independent registered public accounting firm and management, such as any management letter or schedule of unadjusted differences.

13. Recommend to the Board whether the Company's consolidated financial statements should be accepted for inclusion in the Company's annual report on Form 10-K.

*   *   *

23. Report to the Board on a regular basis, and this report shall include a review of any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal and regulatory requirements, the qualifications, independence and performance of the Company's independent auditors and the performance of the internal audit and compliance functions.

**Breaches of Duties**

28. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of KushCo the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

29. During all relevant times, the Individual Defendants knew or should have known of the problems with the Company's internal controls and its deficient accounting and financial reporting practices, procedures, and systems. Through their attendance at Board, Audit Committee, and management meetings, their review of the Company's financial statements, and conversations with the Company's management, auditors, and consultants, the Individual Defendants knew KushCo lacked adequate accounting and financial reporting systems, yet they declined to implement the necessary systems and expertise.

30. In breach of their fiduciary duties of loyalty and good faith and enumerated responsibilities under the Audit Committee Charter (with respect to defendants Hunter, Baum, and Goodstein), the Individual Defendants willfully ignored the deficiencies in the Company's accounting and financial reporting systems and failed to make a good faith effort to address them.

31. The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to operate with seriously deficient internal controls, misrepresent its financial condition, and make

improper statements to the public and KushCo's stockholders.  These improper practices wasted the Company's assets, and caused KushCo to incur substantial damage.

32.     The Audit Committee members had a duty to review the Company's earnings press releases and regulatory filings.  The Audit Committee Defendants breached their duty of loyalty and good faith by approving the improper statements detailed herein and failing to properly oversee KushCo's public statements and internal control function.

33.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of KushCo, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, KushCo has expended, and will continue to expend, significant sums of money.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

34.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

35.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including stockholders of KushCo, regarding the Company's financial condition, the accuracy of its financial statements, its failure to remediate material weaknesses in internal controls, and the Individual Defendants' management of the Company's operations; and (ii) enhance the Individual Defendants' executive and directorial positions at KushCo and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.  In furtherance of this plan,

conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

36.    The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to issue improper financial statements.

37.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

38.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

39.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

**SOON AFTER BECOMING PUBLIC, DEFENDANTS INCORRECTLY ACCOUNT FOR A NUMBER OF ACQUISITIONS**

40.    The Company is engaged in the manufacture and distribution of packaging products, vaporizers, hydrocarbon gases, solvents, accessories, and branding solutions to customers operating in the regulated medical and recreational cannabis industries. Defendants Kovacevich and Imbimbo founded KushCo as a private company in 2010 and

the Company went public in January 2016.

41.     Thereafter, KushCo sought to expand its offerings and footprint by acquiring companies in the cannabis industry.   In May 2017, the Company acquired CMP Wellness, a manufacturer and distributor of Med-ePen brand vaporizer pens, cartridges, tanks, and accessories.  The following year, in May 2018, KushCo acquired Summit, a distributor of hydrocarbon products, such as propane and butane, to the legal cannabis industry.   Then, in July 2018, the Company acquired Hybrid, a creative agency for cannabis ventures, including branding, marketing, web application development, and e-commerce solutions.

42.     Each of these acquisitions included performance based earn-out payments to the stockholders of the respective target companies.  The CMP Wellness and Summit acquisitions each provided for a twelve-month performance based earn-out payment, and the Hybrid acquisition included an earn-out payment based on Hybrid's net revenue performance during the period September 1, 2018 through August 31, 2019.  Pursuant to the earn-out arrangements, KushCo agreed to issue additional KushCo shares to stockholders of the target companies if the acquired business met certain revenue targets. For instance, KushCo agreed to issue up to an additional 1,280,000 shares of KushCo common stock to Summit stockholders if the Summit business achieved certain earn-out milestones of up to $12 million in eligible revenues during the twelve month period following closing.

43.     Given that each earn-out arrangement allowed for a variable number of shares to be issued depending on how the respective business performed, GAAP required the Company to account for the earn-out payments as liabilities on its balance sheet.  *See* Accounting Standards Codification Topic 805, Business Combinations ("ASC 805"). Despite this requirement, in connection with the Company's initial purchase accounting, KushCo classified the earn-out payments as equity.

**THE INDIVIDUAL DEFENDANTS' BREACHES OF DUTY RESULT IN A SERIES OF IMPROPER STATEMENTS**

44.   As detailed below, between July 2017 and January 2019, the Individual Defendants disseminated numerous false and misleading statements concerning the Company's internal controls and its financial status.   In particular, the Individual Defendants represented, or caused the Company to represent, that they were remediating the material weaknesses in KushCo's internal controls, and that, despite the material weaknesses, its financial statements were accurate and complied with GAAP.   As the Company was ultimately forced to admit, all of these statements were woefully inaccurate.   In fact, KushCo continued to operate with material weaknesses in financial and disclosure controls and improperly accounted for contingent consideration related to a number of acquisitions throughout this time.

45.   On July 13, 2017, KushCo filed the Q3 2017 Form 10-Q with the SEC.   For the quarter, the Company reported net income of $6,119 on revenue of $4.72 million, compared to net income of $23,284 on revenue of $2.32 million, for the same period in the prior year.   The Q3 2017 Form 10-Q also stated that the Company had recorded contingent consideration related to its acquisition of CMP Wellness.   The contingent consideration was based on a probability-weighted assessment of the occurrence of CMP Wellness reaching certain gross profit earn-out targets.   In connection with the CMP Wellness earn-out arrangement, the Company recorded contingent consideration of $10,763,760 as equity.   With respect to the contingent cash component of the CMP Wellness earn-out arrangement, the Company reported a contingent liability of $1,735,375.   In describing the contingent consideration related to the CMP Wellness acquisition, the Q3 2017 Form 10-Q stated:

> In accordance with ASC 805, management has evaluated the estimated fair value of the contingent consideration based a probability-weighted assessment of the occurrence of CMP reaching certain gross profit earnout targets. The Company recorded a contingent liability for the

contingent cash consideration of $1,735,375 and recorded contingent equity consideration of $10,763,760. The fair value of the contingent equity consideration is recorded in additional paid[-]in capital.

The acquisition is accounted for under the acquisition method of accounting in accordance with Accounting Standards Codification Topic 805, Business Combinations ("ASC 805"). As such, CMP's assets acquired and liabilities assumed are recorded at their acquisition-date fair values. The results of operations of CMP were consolidated beginning on the date of the merger. Acquisition-related transaction costs are not included as a component of consideration transferred, but are accounted for as an expense in the period in which the costs are incurred. Any excess of the acquisition consideration over the fair value of assets acquired and liabilities assumed is allocated to goodwill. Pursuant to ASC 805, the contingent consideration was recorded at its estimated fair value as of the acquisition date. The subsequent accounting for contingent consideration depends on whether the contingent consideration is classified as a liability or equity. The portion of contingent consideration classified as equity is not remeasured in subsequent accounting periods. However, contingent consideration classified as a liability is remeasured to its fair value at the end of each reporting period and the change in fair value is reflected in income or expense during that period. Any changes within the measurement period resulting from facts and circumstances that existed as of the acquisition date may result in retrospective adjustments to the provisional amounts recorded at the acquisition date.

The equity consideration received by CMP members was calculated based on the negotiated price per share of common stock of the Company of $2.50, which approximated the quoted market price on the acquisition date. The contingent equity consideration was also calculated based on the

negotiated price per share of common stock of the Company of $2.50, which approximated the quoted market price.

\* \* \*

The Company has a contingent consideration liability of $1,785,375, which consists of contingent cash consideration of $1,735,375 resulting from the acquisition of CMP.... The contingent consideration liability is calculated based on the weighted average probability of meeting certain milestones. This liability is remeasured at each reporting period. The Company had no financial assets or liabilities that are measured at fair value on a recurring basis as of August 31, 2016.

\* \* \*

During the three months ended May 31, 2017, the Company did not recognize any change in the fair value of its contingent consideration liability of $1,785,375 from its inception date of May 1, 2017 and May 3, 2017.

46.     The Q3 2017 Form 10-Q also discussed the Company's ineffective internal control over financial reporting.  In particular, the Q3 2017 Form 10-Q noted that KushCo's internal control over financial reporting was not effective as of the third quarter due to missing policies and levels of supervision, inadequate segregation of duties, and the lack of an independent Board or Board committees.  Nonetheless, in the Q3 2017 Form 10-Q, the Company assured investors and analysts that "the weaknesses identified … have not had any material effect on [KushCo's] financial results," and that "despite [these] material weaknesses … [KushCo's] financial statements for the three and nine month periods ended May 31, 2017 are fairly stated, in all material respects, in accordance with U.S. GAAP." The Q3 2017 Form 10-Q also reassured investors and analysts that KushCo was "currently reviewing [its] disclosure controls and procedures related to these material weaknesses" and would "implement changes in the current fiscal year, including identifying specific areas within [its] governance, accounting and

financial reporting processes to add adequate resources to potentially mitigate these material weaknesses." According to the Q3 2017 Form 10-Q, KushCo's management was "monitor[ing] and evaluat[ing] the effectiveness of [the Company's] internal controls and procedures and [its] internal controls over financial reporting on an ongoing basis," and was "committed to taking further action and implementing additional enhancements or improvements, as necessary."

47.     The Q3 2017 Form 10-Q also included "Management's Remediation Plan." As part of its remediation efforts, the Company committed to: (i) "appoint additional qualified personnel to address inadequate segregation of duties and implement modifications to our financial controls to address such inadequacies"; (ii) "adopt a written whistleblower policy and code of ethics"; and (iii) "appoint an independent board of directors, including board committees related to financial controls and reporting." In the Q3 2017 Form 10-Q, the Company promised that "[t]he remediation efforts set out herein *will* be implemented in the current 2017 fiscal year."

48.     While the Individual Defendants were well aware of KushCo's nonexistent, or at the very least, severely deficient internal controls over financial reporting, the Q3 2017 Form 10-Q contained only generic, boilerplate warnings that an error in financial reporting could occur.  In particular, the Q3 2017 Form 10-Q stated:

> Because of its inherent limitations, internal controls over financial reporting may not prevent or detect misstatements. Projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate. All internal control systems, no matter how well designed, have inherent limitations. Therefore, even those systems determined to be effective can provide only reasonable assurance with respect to financial statement preparation and presentation.

49.     The Q3 2017 Form 10-Q was signed and certified as accurate pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by defendants Kovacevich and Martin.  Defendants Kovacevich and Martin certified that the Q3 2017 Form 10-Q "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934," and that "[t]he information contained in the Report fully presents, in all material respects, the financial condition and results of operations [of] the Company."

50.     On November 28, 2017, the Company filed the 2017 Form 10-K with the SEC.   The 2017 Form 10-K was signed by defendants Kovacevich, McCormick, Imbimbo, Baum, and Goodstein.  For fiscal year 2017, the Company reported net income of $69,464 on revenue of $18.79 million, compared to net income of $71,739 on revenue of $8.21 million for fiscal year 2016.  The 2017 Form 10-K also discussed the Company's accounting for the contingent consideration related to its acquisition of CMP Wellness. In particular, the 2017 Form 10-K stated:

> In accordance with ASC 805, management has evaluated the estimated fair value of the contingent consideration based a probability-weighted assessment of the occurrence of CMP reaching certain gross profit earnout targets. The Company initially recorded a contingent liability for the contingent cash consideration of $1,735,375 $1,905,000 and recorded contingent equity consideration of $10,763,760. Based on information obtained during the fourth fiscal quarter, the Company revised its estimate of the contingent cash consideration from $1,735,375 to $1,905,000, and its estimate of the contingent equity consideration from $10,763,760 to $11,852,400. The fair value of the contingent equity consideration is recorded in additional paid[-]in capital.

*     *     *

> The results of operations of CMP were consolidated beginning on the date of the merger. Acquisition-related transaction costs are not included as a component of consideration transferred, but are accounted for as an

expense in the period in which the costs are incurred. Any excess of the acquisition consideration over the fair value of tangible and intangible assets acquired and liabilities assumed is allocated to goodwill. The amount of contingent consideration was recorded at its estimated fair value as of the acquisition date. The subsequent accounting for contingent consideration depends on whether the contingent consideration is classified as a liability or equity. The portion of contingent consideration classified as equity is not remeasured in subsequent accounting periods. However, contingent consideration classified as a liability is remeasured to its fair value at the end of each reporting period and the change in fair value is reflected in income or expense during that period. Any changes within the measurement period resulting from facts and circumstances that existed as of the acquisition date may result in retrospective adjustments to the provisional amounts recorded at the acquisition date.

The equity consideration received by CMP members was calculated based on the negotiated price per share of common stock of the Company of $2.50, which approximated the quoted market price on the acquisition date. The contingent equity consideration (number of common shares) was also calculated based on the negotiated price per share of common stock of the Company of $2.50, which approximated the quoted market price.

*   *   *

The Company has a contingent consideration liability of $1,820,000, which consists of contingent cash consideration of $1,820,000 resulting from the acquisition of CMP.…   The contingent consideration liability is calculated based on the weighted average probability of meeting certain milestones. This liability is remeasured at each reporting period. The Company had no other financial assets or liabilities that are measured at fair value on a recurring basis as of August 31, 2017 and 2016.

\*   \*   \*

During the year ended August 31, 2017, the Company recognized a change in the fair value of its contingent consideration liability of $169,625, which increased liability from $1,735,375 to $1,905,000. A payment of $85,000 was made towards this liability during the year ended August 31, 2017, resulting in a net liability of $1,820,000.

51.  The 2017 Form 10-K also contained substantively the same warnings and reassurances described above regarding KushCo's still-ineffective internal control over financial reporting.  Among other assurances, the 2017 Form 10-K reiterated that "the weaknesses identified … have not had any material effect on our financial results," and that "[m]anagement believes that despite [KushCo's] material weaknesses … [its] financial statements for the year ended August 31, 2017 are fairly stated, in all material respects, in accordance with U.S. GAAP."  Notably, however, while the Q3 2017 Form 10-Q repeatedly asserted that KushCo would implement its remediation efforts during the Company's 2017 fiscal year, the 2017 Form 10-K stated that KushCo would make these changes in the Company's 2018 fiscal year.

52.  The 2017 Form 10-K contained signed certifications pursuant to SOX, whereby defendants Kovacevich and McCormick certified that the 2017 Form 10-K "fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934," and that "the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

53.  On January 16, 2018, KushCo filed its Quarterly Report on Form 10-Q with the SEC, reporting its financial and operating results for the first quarter ended November 30, 2017 (the "Q1 2018 Form 10-Q").  For the period, KushCo reported net income of $94,615 on net revenue of $8.84 million, compared to a net loss of $161,958 on net revenue of $2.47 million for the same period the prior fiscal year.  The Q1 2018 Form 10-Q also discussed the Company's accounting for the contingent consideration related to its

acquisition of CMP Wellness.  In particular, the Q1 2018 Form 10-Q stated:

> In accordance with ASC 805, management has evaluated the estimated fair value of the contingent consideration based a probability-weighted assessment of the occurrence of CMP reaching certain gross profit earnout targets. The Company initially recorded a contingent liability for the contingent cash consideration of $1,735,375 $1,905,000 and recorded contingent equity consideration of $10,763,760. Based on information obtained during the fourth fiscal quarter, the Company revised its estimate of the contingent cash consideration from $1,735,375 to $1,905,000, and its estimate of the contingent equity consideration from $10,763,760 to $11,852,400. The fair value of the contingent equity consideration is recorded in additional paid[-]in capital.

> *   *   *

> The results of operations of CMP were consolidated beginning on the date of the merger. Acquisition-related transaction costs are not included as a component of consideration transferred, but are accounted for as an expense in the period in which the costs are incurred. Any excess of the acquisition consideration over the fair value of tangible and intangible assets acquired and liabilities assumed is allocated to goodwill. The amount of contingent consideration was recorded at its estimated fair value as of the acquisition date. The subsequent accounting for contingent consideration depends on whether the contingent consideration is classified as a liability or equity. The portion of contingent consideration classified as equity is not remeasured in subsequent accounting periods. However, contingent consideration classified as a liability is remeasured to its fair value at the end of each reporting period and the change in fair value is reflected in income or expense during that period. Any changes within the measurement period resulting from facts and circumstances that existed as of the acquisition date

may result in retrospective adjustments to the provisional amounts recorded at the acquisition date.

The equity consideration received by CMP members was calculated based on the negotiated price per share of common stock of the Company of $2.50, which approximated the quoted market price on the acquisition date. The contingent equity consideration (number of common shares) was also calculated based on the negotiated price per share of common stock of the Company of $2.50, which approximated the quoted market price.

\* \* \*

The Company has a contingent consideration liability of $1,820,000, which consists of contingent cash consideration of $1,820,000 resulting from the acquisition of CMP.… The contingent consideration liability is calculated based on the weighted average probability of meeting certain milestones. This liability is remeasured at each reporting period. The Company had no other financial assets or liabilities that are measured at fair value on a recurring basis as of November 30, 2017.

\* \* \*

During the three months ended November 30, 2017, the Company did not recognize any change in the fair value of its contingent consideration liability of $1,820,000.

54.    The Q1 2018 Form 10-Q also noted that KushCo's internal control over financial reporting remained ineffective. However, unlike the Q3 2017 Form 10-Q and 2017 Form 10-K, the Q1 2018 Form 10-Q did not promise to address the material weaknesses in its financial reporting within the current fiscal year.  Rather, the Q1 2018 Form 10-Q stated that the remedial efforts would be implemented "as circumstances, cash flow, and working capital permit."  In particular, the Q1 2018 Form 10-Q stated:

The material weaknesses that existed on August 31, 2017 are described in Part II, Item 9A – Controls and Procedures in our most recent

Annual Report on Form 10-K, filed on November 29, 2017. Due to a lack of financial resources and size, we are not able to, and do not intend to, immediately take any action to remediate these material weaknesses. We will not be able to do so until we acquire sufficient financing to do so. We will implement further controls as circumstances, cash flow, and working capital permit.

55.     Despite the continuing internal control deficiencies, in the Q1 2018 Form 10-Q, the Company once again reassured analysts and investors that its financial statements could be relied upon.  The Q1 2018 Form 10-Q stated:

Notwithstanding the assessment that our disclosure controls and procedures were not effective and that there were material weaknesses as identified in this report, we believe that our financial statements fairly present our financial position, results of operations and cash flows for the periods covered thereby in all material respects.

We have taken steps to enhance our internal control over financial reporting and plan to take additional steps to remediate the material weaknesses. Specifically:

i.      We appointed additional independent members with public company board experience to our board of directors,

ii.     We added staff to our finance team, and outsourced to third party the assessment of certain complex transactions under US GAAP

iii.    On January 2018, we hired a controller with public company experience

We believe that the measures described above will strengthen our internal control over financial reporting. We expect that our efforts, including design, implementation and testing will continue throughout fiscal year 2018.

56.     The Q1 2018 Form 10-Q contained signed certifications pursuant to SOX, whereby defendants Kovacevich and McCormick certified that the Q1 2018 Form 10-Q

"fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934," and that "the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

57.     After the Company filed its Q1 2018 Form 10-Q, KushCo's stock fell more than 22%, or $1.87 per share, from a close of $8.30 per share on January 16, 2018, to a close of $6.43 per share on January 19, 2018, erasing more than $115.5 million in market capitalization.

58.     On April 13, 2018, KushCo filed its Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for second quarter ended February 28, 2018 (the "Q2 2018 Form 10-Q"). For the period, KushCo reported a net loss of $920,314 on net revenue of $10.36 million, compared to net income of $3,619 on net revenue of $2.97 million for the same period in the prior fiscal year. The Q2 2018 Form 10-Q also discussed the Company's accounting for the contingent consideration related to its acquisition of CMP Wellness. In particular, the Q2 2018 Form 10-Q stated:

> In accordance with ASC 805, management has evaluated the estimated fair value of the contingent consideration based a probability-weighted assessment of the occurrence of CMP reaching certain gross profit earnout targets. The Company initially recorded a contingent liability for the contingent cash consideration of $1,735,375 and recorded contingent equity consideration of $10,763,760. Based on information obtained during the fourth fiscal quarter, the Company revised its estimate of the contingent cash consideration from $1,735,375 to $1,905,000, and its estimate of the contingent equity consideration from $10,763,760 to $11,852,400. A payment of $85,000 was made towards this liability during the year ended August 31, 2017, resulting in a net liability of $1,820,000. During the six months ended February, a payment of $170,000 was made towards this liability, resulting in a net liability of $1,650,000. During the three months

ended February 28, 2018, the Company did not recognize any change in the fair value of its contingent consideration liability of $1,650,000.

\* \* \*

The results of operations of CMP were consolidated beginning on the date of the merger. Acquisition-related transaction costs are not included as a component of consideration transferred, but are accounted for as an expense in the period in which the costs are incurred. Any excess of the acquisition consideration over the fair value of tangible and intangible assets acquired and liabilities assumed is allocated to goodwill. The amount of contingent consideration was recorded at its estimated fair value as of the acquisition date. The subsequent accounting for contingent consideration depends on whether the contingent consideration is classified as a liability or equity. The portion of contingent consideration classified as equity is not remeasured in subsequent accounting periods. However, contingent consideration classified as a liability is remeasured to its fair value at the end of each reporting period and the change in fair value is reflected in income or expense during that period. Any changes within the measurement period resulting from facts and circumstances that existed as of the acquisition date may result in retrospective adjustments to the provisional amounts recorded at the acquisition date.

The equity consideration received by CMP members was calculated based on the negotiated price per share of common stock of the Company of $2.50, which approximated the quoted market price on the acquisition date. The contingent equity consideration (number of common shares) was also calculated based on the negotiated price per share of common stock of the Company of $2.50, which approximated the quoted market price.

\* \* \*

The Company has a contingent consideration liability of $1,650,000 which consists of contingent cash consideration of $1,650,000 resulting from the acquisition of CMP.…   The contingent consideration liability is calculated based on the weighted average probability of meeting certain milestones. This liability is remeasured at each reporting period. The Company had no other financial assets or liabilities that are measured at fair value on a recurring basis as of February 28, 2018.

\*   \*   \*

During the year ended August 31, 2017, the Company recognized a change in the fair value of its contingent consideration liability of $169,625, which increased liability from $1,735,375 to $1,905,000. A payment of $85,000 was made towards this liability during the year ended August 31, 2017, resulting in a net liability of $1,820,000. During the six months ended February, a payment of $170,000 was made towards this liability, resulting in a net liability of $1,650,000. During the three months ended February 28, 2018, the Company did not recognize any change in the fair value of its contingent consideration liability of $1,650,000.

59.     Despite the continuing internal control deficiencies, in the Q2 2018 Form 10-Q, the Company once again reassured analysts and investors that its financial statements could be relied upon.  For instance, the Q2 2018 Form 10-Q included the assurance that "[n]otwithstanding the assessment that our disclosure controls and procedures were not effective and that there were material weaknesses as identified" in the 2017 Form 10-K, "our financial statements fairly present our financial position, results of operations and cash flows for the periods covered thereby in all material respects."

60.     Additionally, the Q2 2018 Form 10-Q highlighted that KushCo had enhanced its internal controls during the second fiscal quarter.  In particular, the Q2 2018 Form 10-Q stated:

- 29 -

We have taken steps to enhance our internal control over financial reporting and plan to take additional steps to remediate the material weaknesses. Specifically:

(i) We appointed additional independent members with public company board experience to our board of directors, such that our board of directors is now composed of a majority of independent directors;

(ii) On March 9, 2018, our board of directors formed an Audit Committee composed entirely of independent directors that will, among other things, assist the board of directors in its oversight of the integrity of our financial statements and our financing reporting processes and systems of internal control;

(iii) We have adopted a Code of Business Conduct and Ethics and a whistleblower policy;

(iv) We added staff to our finance team, and outsourced to third party the assessment of certain complex transactions under US GAAP; and

(v) On January 2018, we hired a controller with public company experience

We believe that the measures described above will strengthen our internal control over financial reporting. We expect that our efforts, including design, implementation and testing will continue throughout fiscal year 2018.

61.    The Q2 2018 Form 10-Q contained signed certifications pursuant to SOX, whereby defendants Kovacevich and McCormick certified that the Q2 2018 Form 10-Q "fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934," and that "the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of

the Company."

62.   On July 13, 2018, KushCo filed its Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the third quarter ended May 31, 2018 (the "Q3 2018 Form 10-Q").  For the period, KushCo reported a net loss of $2.16 million, or $0.03 per diluted share, on net revenue of $12.90 million, compared to net income of $6,119, or $0.00 per diluted share, on net revenue of $4.71 million for the same period in the prior fiscal year. The Q3 2018 Form 10-Q also discussed the Company's accounting for the contingent consideration related to its acquisition of CMP Wellness.  In particular, the Q3 2018 Form 10-Q stated:

> In accordance with ASC 805, management has evaluated the estimated fair value of the contingent consideration based a probability-weighted assessment of the occurrence of CMP reaching certain gross profit earnout targets. The Company initially recorded a contingent liability for the contingent cash consideration of $1,735,375 and recorded contingent equity consideration of $10,763,760. Based on information obtained during the fourth fiscal quarter, the Company revised its estimate of the contingent cash consideration from $1,735,375 to $1,905,000, and its estimate of the contingent equity consideration from $10,763,760 to $11,852,400. A payment of $85,000 was made towards this liability during the year ended August 31, 2017, resulting in a net liability of $1,820,000. During the six months ended February, a payment of $170,000 was made towards this liability, resulting in a net liability of $1,650,000. During the three months ended May 31, 2018, the Company did not recognize any change in the fair value of its contingent consideration liability of $1,650,000.

*   *   *

> The results of operations of CMP were consolidated beginning on the date of the merger. Acquisition-related transaction costs are not included as a component of consideration transferred, but are accounted for as an

expense in the period in which the costs are incurred. Any excess of the acquisition consideration over the fair value of tangible and intangible assets acquired and liabilities assumed is allocated to goodwill. The amount of contingent consideration was recorded at its estimated fair value as of the acquisition date. The subsequent accounting for contingent consideration depends on whether the contingent consideration is classified as a liability or equity. The portion of contingent consideration classified as equity is not remeasured in subsequent accounting periods. However, contingent consideration classified as a liability is remeasured to its fair value at the end of each reporting period and the change in fair value is reflected in income or expense during that period. Any changes within the measurement period resulting from facts and circumstances that existed as of the acquisition date may result in retrospective adjustments to the provisional amounts recorded at the acquisition date.

The equity consideration received by CMP members was calculated based on the negotiated price per share of common stock of the Company of $2.50, which approximated the quoted market price on the acquisition date. The contingent equity consideration (number of common shares) was also calculated based on the negotiated price per share of common stock of the Company of $2.50, which approximated the quoted market price.

63.    The Q3 2018 Form 10-Q also discussed the Company's accounting for contingent consideration related to its acquisition of Summit, stating:

The [Summit] acquisition was accounted for using the acquisition method of accounting in accordance with ASC 805, Business Combinations. The consideration paid to the Members of Summit at the closing included the Cash Consideration, consisting of an aggregate of $1.4 million in cash, net of cash received and the Share Consideration, consisting of an aggregate of 1,280,000 shares common stock. $500,000 of the Cash Consideration and

approximately 640,000 shares of common stock from the Share Consideration were held back by the Company for a period of 15 months for potential post-closing working capital and/or indemnification claims relating to, among other things, breaches of representations, warranties and covenants contained in the Merger Agreement. The Members may become entitled to receive earn-out consideration of up to an additional 1,280,000 shares of common stock, in the aggregate, based on the net revenue performance of the Summit business during a one-year period following the closing.

The Company estimated the probability of the contingent consideration at 100% and recorded the earn-out consideration of the additional 1,280,000 shares of common stock in stockholders' equity.

64.    In total, the Company reported contingent consideration liability of $2,150,000 related to its acquisition of CMP Wellness and Summit. The Q3 2018 Form 10-Q stated:

The Company has a contingent consideration liability of $2,150,000 which consists of contingent cash consideration of $1,650,000 resulting from the acquisition of CMP and $500,000 resulting from the acquisition of Summit. The contingent consideration liability is calculated based on the weighted average probability of meeting certain milestones. This liability is remeasured at each reporting period. The Company had no other financial assets or liabilities that are measured at fair value on a recurring basis as of May 31, 2018.

*    *    *

During the nine months ended May 31, 2018, a payment of $170,000 was made towards this liability, an increase of $500,000 resulted from the Summit acquisition, resulting in a net liability of $2,150,000. During the three months ended May 31, 2018, the Company did not recognize any

- 33 -

change in the fair value of its contingent consideration liability of $2,150,000.

65.   The Q3 2018 Form 10-Q also contained substantively the same warnings and reassurances described above concerning its still-ineffective internal control over financial reporting.  In particular, the Q3 2018 Form 10-Q included the assurance that "[n]otwithstanding the assessment that our disclosure controls and procedures were not effective and that there were material weaknesses as identified" in the 2017 Form 10-K, "our financial statements fairly present our financial position, results of operations and cash flows for the periods covered thereby in all material respects." The Q3 2018 Form 10-Q also touted the same enhanced remedial measures as the Q2 2018 Form 10-Q.

66.   The Q3 2018 Form 10-Q contained signed certifications pursuant to SOX, whereby defendants Kovacevich and McCormick certified that the Q3 2018 Form 10-Q "fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934," and that "the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

67.   On November 29, 2018, KushCo filed its Annual Report on Form 10-K with the SEC, reporting its financial and operating results for the fiscal year ended August 31, 2018 (the "2018 Form 10-K"). The 2018 Form 10-K was signed by defendants Kovacevich, Tedford, Baum, Goodstein, Imbimbo, and Hunter.  For fiscal year 2018, KushCo reported a net loss of $10.19 million, or $0.16 per diluted share, on net revenue of $52.07 million, compared to a net income of $69,464, or $0.00 per diluted share, on net revenue of $18.79 million for fiscal year 2017.  The 2018 Form 10-K also discussed the Company's accounting for contingent consideration related to its acquisitions of CMP Wellness, Summit, and Hybrid.  With respect to CMP Wellness, the 2018 Form 10-K stated:

> In accordance with ASC 805, management has evaluated the estimated fair value of the contingent consideration based a probability-

weighted assessment of the occurrence of CMP reaching certain gross profit earnout targets. The Company initially recorded a contingent liability for the contingent cash consideration of $1,735,375 $1,905,000 and recorded contingent equity consideration of $10,763,760. Based on information obtained during the fourth fiscal quarter, the Company revised its estimate of the contingent cash consideration from $1,735,375 to $1,905,000, and its estimate of the contingent equity consideration from $10,763,760 to $11,852,400. The fair value of the contingent equity consideration is recorded in additional paid[-]in capital.

* * *

The results of operations of CMP were consolidated beginning on the date of the merger. Acquisition-related transaction costs are not included as a component of consideration transferred, but are accounted for as an expense in the period in which the costs are incurred. Any excess of the acquisition consideration over the fair value of tangible and intangible assets acquired and liabilities assumed is allocated to goodwill. The amount of contingent consideration was recorded at its estimated fair value as of the acquisition date. The subsequent accounting for contingent consideration depends on whether the contingent consideration is classified as a liability or equity. The portion of contingent consideration classified as equity is not remeasured in subsequent accounting periods. However, contingent consideration classified as a liability is remeasured to its fair value at the end of each reporting period and the change in fair value is reflected in income or expense during that period. Any changes within the measurement period resulting from facts and circumstances that existed as of the acquisition date may result in retrospective adjustments to the provisional amounts recorded at the acquisition date.

* * *

The equity consideration received by CMP members was calculated based on the negotiated price per share of common stock of the Company of $2.50, which approximated the quoted market price on the acquisition date. The contingent equity consideration (number of common shares) was also calculated based on the negotiated price per share of common stock of the Company of $2.50, which approximated the quoted market price.

68.    With regard to its acquisition of Summit, in the 2018 Form 10-K the Company reported an estimated fair value contingent equity consideration of $3,193,907, and a total fair value of consideration and total estimated acquisition consideration of $10,680,666, as adjusted for August 31, 2018, compared to an estimated fair value contingent equity consideration of $7,155,200, and a total fair value of consideration and total estimated acquisition consideration of $15,755,618, as initially reported on May 2, 2018.[2]  The 2018 10-K also stated:

The [Summit] acquisition was accounted for using the acquisition method of accounting in accordance with ASC 805, Business Combinations. The consideration paid to the Members of Summit at the closing included the Cash Consideration, consisting of an aggregate of $905,231 in cash, net of cash received, $187,849 in cash held back and the Share Consideration, consisting of an aggregate of 1,280,000 shares common stock. $187,849 of the Cash Consideration and approximately 640,000 shares of common stock from the Share Consideration were held back by the Company for a period of 15 months for potential post-closing working capital and/or indemnification claims relating to, among other things, breaches of

_____

[2] For the Summit acquisition, the Q3 2018 Form 10-Q did not explicitly list an estimated fair value contingent equity consideration of $7,155,200, nor a total fair value of consideration and total estimated acquisition consideration of $15,755,618, as initially reported May 2, 2018.  Instead, the Q3 2018 Form 10-Q listed these two values as KushCo's contingent company stock consideration and total purchase price, respectively, from the Summit acquisition.

representations, warranties and covenants contained in the Merger Agreement. The Members may become entitled to receive earn-out consideration of up to an additional 1,280,000 shares of common stock, in the aggregate, based on the net revenue performance of the Summit business during a one-year period following the closing.

69.  With regard to KushCo's acquisition of Hybrid, the 2018 Form 10-K reported an estimated fair value contingent equity consideration of $920,000, and a total fair value of consideration and total estimated acquisition consideration of $4,178,492. The 2018 Form 10-K also stated:

> The [Hybrid] acquisition was accounted for using the acquisition method of accounting in accordance with ASC 805, Business Combinations. The consideration paid to the Members of Hybrid at the closing included the Cash Consideration, consisting of an aggregate of $847,187 in cash, net of cash received, $82,106 in cash held back and the Share Consideration, consisting of an aggregate of 360,000 shares common stock. $82,106 of the Cash Consideration and 162,000 shares of common stock from the Share Consideration were held back by the Company issuable on January 1, 2019. The Members may become entitled to receive earn-out payments of up to $1.37 million, through a combination of cash and stock payments, based on the net revenue performance of the Hybrid business during the period September 1, 2018 through August 31, 2019.

70.  While the 2018 Form 10-K stated that KushCo's internal control over financial reporting was still ineffective, it noted that the Company suffered from fewer material weaknesses, now including only "inadequate segregation of duties consistent with control objectives" and a "lack of multiple levels of supervision and review." Further, in the 2018 Form 10-K, the Company also assured investors that while "[c]ertain of the material weaknesses in internal control over financial reporting as of August 31, 2018 … remain unchanged from August 31, 2017," "the weaknesses identified … have

not had any material effect on our financial results."  The 2018 Form 10-K reiterated that "despite our material weaknesses set forth above, our financial statements for the fiscal year ended August 31, 2018 are fairly stated, in all material respects, in accordance with U.S. GAAP."

71.    Moreover, despite the continuing deficiencies in KushCo's internal controls, the 2018 Form 10-K contained substantively the same generic, boilerplate warnings that an error in financial reporting could occur. The 2018 Form 10-K also noted that management would continue their remediation plan for KushCo's remaining material weaknesses in internal control over financial reporting in the Company's 2019 fiscal year.

72.    The 2018 Form 10-K contained signed certifications pursuant to SOX, whereby defendants Kovacevich and Tedford certified that the 2018 Form 10-K "fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934," and that "the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

73.    On January 8, 2019, KushCo filed its Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the first quarter ended November 30, 2018 (the "Q1 2019 Form 10-Q"). For the quarter, KushCo reported a loss of $8.18 million, or $0.10 per diluted share, on net revenue of $25.31 million, compared to a net income of $94,615, or $0.00 per diluted share, on net revenue of $8.84 million for the same period the prior fiscal year.  With regard to KushCo's contingent consideration related to its acquisition of CMP Wellness, Summit, and Hybrid, the Q1 2019 Form 10-Q stated:

> The Company has contingent consideration outstanding associated with its prior business combinations. The Company accounts for business combinations under the acquisition method and allocates the total purchase price for acquired businesses to the tangible and identified intangible assets acquired and liabilities assumed, based on their estimated fair values as of the acquisition date. A liability for contingent consideration, if applicable, is

recorded at fair value as of the acquisition date and, evaluated each period for changes in the fair value and adjusted as appropriate.

The Company's contingent consideration as of November 30, 2018 was $672,849, consisting of $187,849 from the Summit acquisition and $485,000 from the Hybrid acquisition.

The Company's contingent consideration as of August 31, 2018 was $754,955, consisting of $187,849 from the Summit acquisition and $532,106 from the Hybrid acquisition.

74. The Q1 2019 Form 10-Q also noted that KushCo's internal control over financial reporting was still ineffective because the Company suffered from the same material weaknesses identified in the 2018 Form 10-K. The Q1 2019 Form 10-Q nonetheless continued to tout KushCo's remediation measures, which included the same measures identified in its Q2 2018 Form 10-Q and Q3 2018 Form 10-Q. The Company's remediation efforts also included its "hiring of [its] new Chief Financial Officer, Christopher Tedford, with significant sales and distribution experience who will focus on the development of the finance and accounting function."

75. Additionally, while the Q1 2019 Form 10-Q did not contain the same assurances as its previous reports, quoted above, that KushCo and its management believed their financial statements and representations were accurate and fairly presented despite material weaknesses in KushCo's internal controls, the Q1 2019 Form 10-Q nonetheless assured investors that "[t]here ha[d] been no change in [KushCo's] internal control over financial reporting" regarding "the effectiveness of [KushCo's] internal control over financial reporting" that occurred during the period, "that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting."

76. The Q1 2019 Form 10-Q contained signed certifications pursuant to SOX, whereby defendants Kovacevich and Tedford certified that the Q1 2019 Form 10-Q "fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the

Securities Exchange Act of 1934," and that "the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

## REASONS THE STATEMENTS WERE IMPROPER

77.   The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing:

(a)   the Company was improperly accounting for contingent consideration related to its acquisitions;

(b)   the Company was overstating its earnings for years;

(c)   the Company would not cure the material deficiencies in its financial and internal controls in the timeframe stated;

(d)   the Company's financial statements could not be relied upon; and

(e)   as a result of the foregoing, several years of representations concerning the Company's financial condition, business prospects, and internal controls were improper.

## THE TRUTH EMERGES

78.   The truth behind the Company's business prospects and Individual Defendants' wrongdoing began to emerge on April 9, 2019, when KushCo filed with the SEC a Current Report on Form 8-K and issued a press release announcing the Company's decision to restate prior period financial statements for fiscal years 2017 and 2018 for noncash items related to the acquisitions of CMP Wellness, Summit, and Hybrid.  The Form 8-K disclosed that KushCo had inaccurately accounted for certain shared-settled contingent consideration relating to its CMP Wellness, Summit, and Hybrid acquisitions, by recording their respective earnout arrangements as equity rather than as liabilities.  In particular, the Form 8-K stated:

On April 8, 2019, the Audit Committee of the Board of Directors (the "Audit Committee") of KushCo Holdings, Inc. (the "Company"), after

discussion with management of the Company and the Company's independent registered public accounting firm, RBSM LLP ("RBSM"), concluded that *the Company's previously issued audited consolidated financial statements as of and for the fiscal years ended August 31, 2018 and 2017 included in the Company's Annual Reports on Form 10-K for such periods and unaudited condensed consolidated interim financial statements as of and for the fiscal periods ended May 31, 2017, November 30, 2017, February 28, 2018, May 31, 2018 and November 30, 2018 included in the Company's Quarterly Reports on Form 10-Q for such periods should no longer be relied upon. Similarly, management's reports on the effectiveness of internal controls over financial reporting, earnings releases, and investor communications describing the financial statements for the periods described above should no longer be relied upon.*

As part of preparing its condensed consolidated interim financial statements as of and for the fiscal period ended February 28, 2019, *the Company identified inadvertent errors in the accounting for certain shared-settled contingent consideration ("Contingent Consideration") relating to the Company's acquisition of CMP Wellness in May 2017, Summit Innovations in May 2018, and Hybrid Creative in July 2018. In connection with those acquisitions, Contingent Consideration relating to the respective earnout arrangements were recorded as equity. Upon further evaluation, the Company determined that the Contingent Consideration should have been accounted for as liabilities with changes in the fair value recorded in the Company's consolidated statements of operations.*

\*   \*   \*

The Company expects the corrected misstatements to have the following impact on its restated annual consolidated financial statements:

- ***Increase net loss from $10.2 million to $24.3 million during its fiscal year ended August 31, 2018;***
- Increase net income from $0.1 million to $1.7 million during its fiscal year ended August 31, 2017;
- No impact on its net revenue or gross profit for any of the restated fiscal periods; and
- No impact on its cash flows from operations for any of the restated fiscal periods.

The Company intends to file such amended reports as soon as practicable.

*Management has concluded that the Company's internal control over financial reporting and its disclosure controls and procedures were not effective as of the end of the respective restatement periods.* The Company will amend any disclosures pertaining to its evaluation of such internal controls and procedures, as appropriate, in connection with the amended 10- K and 10-Q filings. In February 2019, the Company engaged a national accounting advisory firm to assist with the design and implementation of its internal controls over financial reporting based on the criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

## DAMAGES TO KUSHCO

79.    As a result of the Individual Defendants' improprieties, KushCo disseminated improper, public statements concerning the Company's financial condition, financial controls, and disclosure controls and procedures.  These improper statements have devastated KushCo's credibility as reflected by the Company's almost $40 million, or 7.76%, market capitalization loss.

80.    KushCo's performance issues also damaged its reputation within the business community and in the capital markets.  In addition to price, KushCo's current

and potential investors consider a company's trustworthiness, stability, and ability to evaluate known risks.  Investors are less likely to invest in companies that disseminate improper statements, fail to comply with their own internal protocols and external regulations, and are uncertain about their own financial condition. KushCo's ability to raise equity capital or debt on favorable terms in the future is now impaired.  In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

81.    Further, as a direct and proximate result of the Individual Defendants' actions, KushCo has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to:

(a)    costs incurred from the Company's internal investigation and review of the accounting violations;

(b)    costs incurred from restating and revising past financial statements;

(c)    costs incurred from defending and paying any settlement in the Securities Class Action; and

(d)    costs incurred from compensation and benefits paid to the defendants who have breached their duties to KushCo.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

82.    Plaintiff brings this action derivatively in the right and for the benefit of KushCo to redress injuries suffered, and to be suffered, by KushCo as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  KushCo is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

83.    Plaintiff will adequately and fairly represent the interests of KushCo in enforcing and prosecuting its rights.

84.   Plaintiff was a stockholder of KushCo at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current KushCo stockholder.

85.   The current Board of KushCo consists of the following five individuals: defendants Kovacevich, Baum, Goodstein, Hunter, and Imbimbo.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because Defendants Kovacevich, Baum, Goodstein, Hunter, and Imbimbo Face a Substantial Likelihood of Liability for Their Misconduct**

86.   As alleged above, defendants Kovacevich, Baum, Goodstein, Hunter, and Imbimbo breached their fiduciary duties of loyalty by knowingly or recklessly causing or allowing the Company to consistently misrepresent its financial condition and internal control remediation efforts.  Defendants Kovacevich, Baum, Goodstein, Hunter, and Imbimbo each failed to ensure that the Company maintained adequate controls over its internal accounting and financial reporting functions.

87.   Defendants Hunter, Baum, and Goodstein, as members of the Audit Committee, were responsible for overseeing the integrity of the Company's financial statements and the Company's internal accounting and financial controls.  These defendants each failed to ensure that the Company implemented adequate controls over its internal accounting and financial reporting functions.  Further, the Audit Committee Defendants were responsible for knowingly or recklessly allowing the improper statements related to the Company's financial and disclosure controls.  Despite their knowledge or reckless disregard, the Audit Committee Defendants caused these improper statements.  Accordingly, the Audit Committee Defendants breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein.  Thus, the Audit Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

**Demand Is Excused Because Defendants Kovacevich and Imbimbo Dominate and Control the Board**

88.     Demand is futile because defendants Baum, Goodstein, and Hunter will not vote to initiate litigation against defendants Kovacevich and Imbimbo.  Every member of the Board is beholden to defendants Kovacevich and Imbimbo.  Defendants Kovacevich and Imbimbo are cofounders and 27% owners of KushCo.  Defendant Kovacevich has also closely overseen the business operations of KushCo since its establishment and has been significantly involved in the day-to-day business operations at KushCo.  The entire Board is dependent, in significant part, on defendants Kovacevich and Imbimbo for their seats on the Board, and would be expelled from their positions of power at KushCo, and the perquisites derived therefrom, for bringing the derivative claims against defendants Kovacevich and Imbimbo.   Accordingly, the Board is disabled from fairly and objectively considering a presuit demand to bring, let alone vigorously prosecute, the derivative claims asserted against themselves and defendants Kovacevich and Imbimbo in this action.

**Demand Is Excused as to Defendants Kovacevich, Imbimbo, and Baum for Additional Reasons**

89.     In addition, demand is futile because defendants Kovacevich, Imbimbo, and Baum will not vote to initiate litigation against each other due to their long-standing personal and professional ties to each other.  Defendants Kovacevich and Imbimbo have a long-standing personal relationship.  Defendants Kovacevich and Imbimbo's close friendship dates back nearly twenty years to their high school days at Bellarmine College Preparatory in San Jose, California.  During high school, the two were both members of Bellarmine College Preparatory's basketball team.   Since high school, defendants Kovacevich and Imbimbo have filed multiple business relationships on top of that friendship.  In particular:

(a)     In 2007, defendant Imbimbo founded PackMyDorm ("PMD"), a college moving and storage solutions company.  Kovacevich was an early investor in

PMD and helped defendant Imbimbo eventually sell it to a California-based moving company.

(b)     Defendants Kovacevich and Imbimbo cofounded KushCo in 2010.

(c)     In 2011, defendants Kovacevich and Imbimbo cofounded 3 Kings Ventures, LLC ("3 Kings"), a company that invests in and develops distressed residential real estate.   The pair continues to own 3 Kings. KushCo paid 3 Kings hundreds of thousands of dollars in rent payments in fiscal 2018 and 2017.

(d)     In March 2012, defendants Kovacevich and Imbimbo cofounded BigRentz Inc. ("BigRentz"), an online construction equipment rental marketplace. Defendants Kovacevich, Imbimbo, and Baum all currently serve as directors of BigRentz. In addition, between March 2012 and September 2014, defendant Kovacevich served as Chief Operating Officer of BigRentz, and between March 2012 and April 2017, defendant Imbimbo served as CEO of that company.

(e)     In 2017, defendants Kovacevich and Imbimbo cofounded Alpha West Holdings ("Alpha West"), a venture capital firm. Since at least December 2017, defendant Imbimbo has served as managing partner of Alpha West.

90.     Defendant Baum also has ties to defendants Kovacevich and Imbimbo. Defendant Baum was an early investor in KushCo and helped the Company get off the ground.   As of December 28, 2018, defendant Baum owned 1.1% of the Company's stock.   According to an April 22, 2018 article published by the *Cannabis Business Executive*, defendants Kovacevich and Imbimbo have been able to "call on the expertise Eric Baum, a friend and board member … who has brought much needed insight and strategic thinking to the team."

91.     As a result of these long-standing personal and professional ties, defendants Kovacevich, Imbimbo, and Baum will not vote to initiate litigation against each other.

92.     Plaintiff has not made any demand on the other stockholders of KushCo to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)     KushCo is a publicly held company with over eighty-eight million shares outstanding and thousands of stockholders as of April 11, 2019;

(b)     making demand on such a number of stockholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of stockholders; and

(c)     making demand on all stockholders would force plaintiff to incur excessive expenses, assuming all stockholders could be individually identified.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

93.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

94.    The Individual Defendants owed and owe KushCo fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe KushCo the highest obligation of good faith, fair dealing, loyalty, and due care.

95.    The Individual Defendants and each of them, violated and breached their fiduciary duties of good faith and loyalty.

96.    The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the improper activity of such substantial magnitude and duration.  The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing: (i) the Company was improperly accounting for contingent consideration related to its CMP Wellness, Summit, and Hybrid acquisitions, by recording their respective earn-out arrangements as equity rather than liabilities; (ii) the Company would not cure the material weaknesses in its financial and internal controls in the timeframe stated, and would continue to operate with inadequate internal controls for the foreseeable future; (iii) the Company's financial statements could not be relied upon; and (iv) as a result of the foregoing, several years of representations concerning the Company's financial condition and internal controls were improper.  Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

97.     The Director Defendants, as directors of the Company, owed KushCo the highest duty of loyalty.  These defendants breached their duty of loyalty by recklessly permitting the improper activity detailed herein.  The Director Defendants knew or were reckless in not knowing that: (i) the Company was improperly accounting for contingent consideration related to its acquisitions, by recording certain earn-out arrangements as equity rather than liabilities; (ii) the Company would not cure the material weaknesses in its financial and internal controls in the timeframe stated, and would continue to operate with inadequate internal controls for the foreseeable future; (iii) the Company's financial statements could not be relied upon; and (iv) as a result of the foregoing, KushCo's statements about its business, operations, and financial condition were improper. Accordingly, these defendants breached their duty of loyalty to the Company.

98.     The Audit Committee Defendants breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions.  The Audit Committee Defendants completely and utterly failed in their duty of oversight, and failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

99.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, KushCo has sustained significant damages, as alleged herein. As a result of the misconduct alleged herein, these defendants are liable to the Company.

100.    Plaintiff, on behalf of KushCo, has no adequate remedy at law.

## COUNT II

### Against the Individual Defendants for Waste of Corporate Assets

101.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

102.    As a result of the misconduct described above, the Individual Defendants have wasted corporate assets by forcing the Company to expend valuable resources in defending itself in the Securities Class Action that they brought on with their improper

statements.  In addition, due to the Individual Defendants' mismanagement, the Company has been forced to interrupt its business and dedicate its resources and attention to restating and revising its past financial statements.

103.   In addition, as a result of the decision to allow the Company to operate in an environment devoid of adequate internal and financial controls, the Individual Defendants have caused KushCo to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

104.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

105.   Plaintiff, on behalf of KushCo, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Unjust Enrichment

106.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

107.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of KushCo.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to KushCo.

108.   Plaintiff, as a stockholder and representative of KushCo, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

109.   Plaintiff, on behalf of KushCo, has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of KushCo, demands judgment as follows:

A.   Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary

duties, waste of corporate assets, and unjust enrichment;

B.      Ordering defendants to provide to plaintiff and the investing public accurate operational reports and financial statements for all previous quarters and years identified as inaccurate;

C.      Ordering defendants to take whatever measures are reasonably necessary to ensure they publish timely and accurate operational reports and financial statements for all quarterly and annual periods going forward;

D.      Directing KushCo to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect KushCo and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.      a proposal to strengthen the Company's controls over financial reporting;

2.      a proposal to strengthen KushCo's oversight of its disclosure procedures;

3.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

4.      a proposal to add at least three truly independent directors; and

5.      a provision to permit the stockholders of KushCo to nominate at least three candidates for election to the Board;

E.      Requiring that the Company add at least two female directors to the Board, as mandated by California Senate Bill 826, which requires publicly held companies based in California with five directors to have a minimum of two females on their boards of directors;

F. Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of KushCo has an effective remedy;

G. Awarding to KushCo restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

H. Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

I. Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: May 24, 2019

ROBBINS ARROYO LLP
BRIAN J. ROBBINS
CRAIG W. SMITH
SHANE P. SANDERS


_/s/Brian J. Robbins_
BRIAN J. ROBBINS

5040 Shoreham Place
San Diego, CA 92122
Telephone:  (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsarroyo.com
        csmith@robbinsarroyo.com
        ssanders@robbinsarroyo.com

Attorneys for Plaintiff

1355701

## VERIFICATION

I, Martin Salsberg, hereby declare as follows:

I am the plaintiff in the within entitled action. I have read the Verified Stockholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: 23 May, 2019

MARTIN SALSBERG